IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| AUDREY BURTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 11-3164 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

This is an action for judicial review of the final decision of the Commissioner of Social Security (the Commissioner), finding that Plaintiff was not entitled to Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) under Titles II or XVI of the Social Security Act. Pending before the Court are the Plaintiff's Motion for Summary Judgment and the Commissioner's Motion for Summary Affirmance.

## I. INTRODUCTION

The Plaintiff, Audrey Burton, applied for DIB and SSI in January of 2007, alleging that she became disabled on August 24, 2006. Her onset

date was later amended to April 1, 2007. The Plaintiff's applications were denied initially and upon reconsideration. Following a hearing before an administrative law judge (ALJ), on October 9, 2009, the ALJ found that Plaintiff was not disabled and denied her claim because she could perform a significant number of jobs in the national economy. For purposes of judicial review, the ALJ's decision became the Commissioner's final decision on April 11, 2011, when the Appeals Council denied her request for review. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), the Plaintiff seeks review.

## II. FACTUAL BACKGROUND

### A. Plaintiff's history

The Plaintiff was born on November 10, 1957. She has a tenth grade education. The Plaintiff has work experience as a cashier, nurse aid, floor supervisor and photographic technician.

The Plaintiff alleges she became disabled because of osteoarthritis, knee problems, depression, high blood pressure, diabetes, and asthma. The Plaintiff's depression was controlled with medication. Her problems resulted in difficulty with sitting, standing, walking, lifting, climbing and

carrying. The Plaintiff testified that she uses a cane to walk. Moreover, she could stand for only a few minutes, sit for thirty to forty minutes, and walk for about 20 to 30 feet. She could alternate between sitting and standing for one hour, and then had to lie down. The Plaintiff testified that her knee would sometimes swell late during the day. She alternated between icing and heating the knee. In a typical day at home, she kept her legs elevated on a pillow for most of the day.

When she applied for DIB and SSI, the Plaintiff listed her height as 5'2" and weight as 302 pounds. James Bohan, M.D., was the Plaintiff's primary care physician. The office notes prepared in conjunction with the Plaintiff's appointments with Dr. Bohan sometimes provided that Plaintiff was "obese" or "morbidly obese."

The Plaintiff alleges that her A1C[1] showed consistent problems effectively controlling her diabetes. In February 2006, it was 8. Four months later, it was 8.1 and her blood sugar around the same time was 230.

---

[1]The A1C test result reflects your average blood sugar level for the past two to three months. The higher an individual's A1C level, the poorer her blood sugar control and greater the risk of diabetes complication. *See* www.mayoclinics.com/health/a1c-test/MY00142.

In July 2007, her A1C level was 8.1. It was 8.3 in January 2008 and was 9.0 in September 2008. In February 2009, the Plaintiff's A1C level was 7.6. At the time, her blood sugar level was 181. In August 2009, her blood sugar level was 229. There is no A1C test in the record with a level at or below that which is (usually 7 or less) deemed "good control" for a diabetic.

In February 2010, the Plaintiff was diagnosed as having joint effusion and subcutaneous swelling in her knee. A September 2006 MRI revealed moderate degeneration and torn ligaments. A contemporaneous x-ray showed degeneration of the knees, particularly the right knee. In October 2006, the Plaintiff was told by Harvey Scott, M.D., that she should limit work to five ½ days per week–half days, five days per week. In March 2007, after she had been off work, the Plaintiff was released by Dr. Bohan to return to work two days per week for no more than six hours per day and primarily in a seated position.

After the Plaintiff's alleged onset of disability, on May 7, 2007, Marion Panepinto, M.D., a State agency physician, examined the record and opined that Plaintiff could perform light work that did not involve

climbing ladders, ropes, or scaffolds; only occasionally climbing ramps and stairs, kneeling, crouching and crawling; and she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Panepinto specifically noted the Plaintiff's allegations of disability due to osteoarthritis, knee problems, high blood pressure, diabetes, and breathing problems. Moreover, he was aware of the Plaintiff's history of knee pain, obesity, and recent treatment with Dr. Scott.

On August 2, 2007, four months after the Plaintiff's alleged onset date, Dr. Bohan released her to return to work. On September 4, 2007, Ernst Bone, M.D., reviewed the record and affirmed Dr. Panepinto's opinion. As previously noted, Dr. Bohan treated the Plaintiff for a number of medical problems. On May 14, 2008, Dr. Bohan again referred the Plaintiff to Dr. Scott due to Plaintiff's history of knee pain complicated by obesity. On June 25, 2008, the Plaintiff told Dr. Bohan that she felt better and was able to be more active. Her respiration was even and un-labored. The Plaintiff had some pedal edema, but an otherwise unremarkable examination.

By March 2008, the Plaintiff's knees had clinically observed crepitance. She was referred to an orthopedic specialist. Barry Werries, M.D., examined the Plaintiff on July 21, 2008. Dr. Werries noted that two years earlier, the Plaintiff had fallen and injured her knee and had experienced pain off and on, and in the past six months had recurrent pain. The Plaintiff complained of feeling popping and catching in her knee and described her pain as moderate, rating it as a five on a ten-point scale. She had limited motion in her knees, but no ligamentous instability. Dr. Werries observed that Plaintiff walked with an antalgic gait. Dr. Werries determined that Plaintiff had osteoarthritis and an x-ray revealed spurring and narrowing of the joint space.

The Plaintiff also had gout, which affected her right great toe. She saw a specialist for sleep apnea, who advised the Plaintiff regarding better compliance, the importance of weight loss and not to drive when tired. She repeatedly complained of knee pain to Dr. Bohan. In 2008, she developed clinically observed edema of her feet and ankles. In February 2009, the Plaintiff fell and injured her right knee. She injured her left knee when she

fell in December 2009. An MRI revealed osteochondral lesions and a joint effusion. There were also irregularities of the joint space, tricompartmental degeneration, and a focal chondral defect. Dr. Bohan's records indicate that he prescribed vicodin for pain, in addition to anti-inflammatories.

In February 2009, the Plaintiff advised Dr. Bohan that her blood sugars were 125 to 150 in the morning and 77 to 160 in the afternoon. She noted her blood sugars were better and that she was trying to exercise.

On August 27, 2009, the Plaintiff was seen in the emergency room for congestion. She was assessed with an upper respiratory injection, given medication, and discharged in stable condition.

The Plaintiff had positive tinel's and Phalen's signs in her right wrist. The Commissioner alleges that although the Plaintiff reported having arthritis and carpal tunnel syndrome in her hands, she did not have much trouble using kitchen tools, opening twist lids on jars or food packages, turning pages of a book or newspaper, dialing a phone, picking up a coin, or using a pencil.

B. Hearing testimony

In a report to the agency, the Plaintiff stated that she was able to clean, vacuum, dust, do laundry, and do yard work. The Plaintiff testified that she was able to drive, though she has difficulty getting into the car and is unable to do much driving. Although it is difficult for her to get out of the bath tub, the Plaintiff is able to care for her personal hygiene. Moreover, it takes longer for the Plaintiff to dress herself. She says she is out of breath by the time she finishes. The Plaintiff has difficulty with grocery shopping and uses a scooter. In terms of household chores, she has to sit when mopping or sweeping. The Plaintiff testified that she vacuums rarely–once or twice a month–because of problems standing for long periods of time. The Plaintiff makes the bed by "yank[ing] the covers up."

At the hearing, the Plaintiff testified that she was 51 years old, 5'2" tall and weighed 298 pounds. She stopped working altogether in May 2008. During the last year of her job, the Plaintiff requested that her hours be reduced, stopped working as a photo processor, and was assigned to overnight cashiering so that she could sit when not assisting customers. She had difficulty working as a cashier when she had to stand because she

needed her cane, which slowed her down. The Plaintiff complained that using her hands became increasingly difficult because of problems with arthritis and carpal tunnel syndrome. The swelling in her extremities increased as the day progressed. As a result, the Plaintiff spent much of the time on the couch with her legs elevated. To deal with her swelling, the Plaintiff took furosemide, which she said caused very frequent urination–sometimes every five minutes. The Plaintiff testified that her pain affected her ability to concentrate.

A vocational expert, Ron Malik, testified that if a person of Plaintiff's age, education and past work was limited to sedentary work with a sit/stand option, she could not perform any of her past relevant work. However, he stated that her cashier work "had skills that transfer to sedentary cashier positions." There are two such positions, which are described in the Dictionary of Occupational Titles as 211.482-010 and 211.482-014. Malik testified there are over 19,000 such positions in Illinois and over 450,000 in the national economy. However, if the Plaintiff missed work due to medical problems four or more times per month, she could not perform

those jobs or any jobs.

Malik elaborated that with a sit/stand at will option, elevation of the lower extremities could occur only when sitting, and that elevation could only occur "[a] little underneath the desk." Because cashiering work involves handling money, such positions require focus and attention to detail. Malik clarified that an individual who missed three or more days of work could not sustain employment. Moreover, it would not be easy to do cashier work if a cane was needed for support.

C. ALJ's decision

The ALJ found that although Plaintiff had worked since allegedly becoming disabled, she had not engaged in any substantial gainful activity since her alleged onset date. He further found that Plaintiff's severe impairments consisted of obesity, diabetes, exacerbations of recurrent bronchitis, and osteoarthritis in the right knee.

The ALJ determined that Plaintiff did not have an impairment that met one of the listed impairments at 20 C.F.R. Part 404, Subpart p, Appendix 1. In considering the Plaintiff's residual functional capacity, the

ALJ observed:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) but is limited to work that allows for a sit/stand option; work that involves no more than frequent balancing and stooping; work that involves no more than occasional climbing of ramps and stairs; work that involves no more than occasional kneeling, crouching or crawling; and work that involves no climbing of ladders, ropes or scaffolds. The claimant is limited to work activity that involves no concentrated exposure to fumes, odors, dusts or gases.

R. 20. The ALJ found that Plaintiff was "less than fully credible" because she testified that her diabetes was poorly controlled. He noted there was evidence it was properly controlled and based this finding on the Plaintiff's testimony that she sometimes strayed from her diet due to stress, which resulted in low blood sugar readings. The ALJ found that Plaintiff's lack of credibility regarding the control of her diabetes applied to her other alleged limitations, stating that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity assessment." R. 21. The Seventh Circuit has on a number of occasions criticized this and/or similar language as "meaningless boilerplate" and as an unhelpful template. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012); *Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010).

The ALJ reviewed the medical note in the record, wherein her doctor said she was released to work five half-days per week. The ALJ stated that he must consider the Plaintiff's obesity, which he noted may affect many functions. These include standing, walking, lifting, carrying, pushing, pulling and sitting. Moreover, obesity may affect the use of one's hands and fingers due to the presence of adipose tissue. After noting these and other potential effects of obesity, the ALJ stated, "The undersigned has considered the foregoing with regard to the claimant's obesity in formulating the residual functional capacity in this decision." R. 24. The ALJ concluded that Plaintiff's testimony that she was unable to work full-time was not fully supported by the record. Moreover, he determined that

there were inconsistencies regarding her resultant limitations and actual functioning.

The ALJ then turned to the testimony of the vocational expert. He noted Malik's testimony that Plaintiff had previously worked as a cashier and she had acquired skills which were transferable to the two sedentary cashier jobs. The ALJ found that the testimony of the vocational expert was "consistent with the information contained in the *Dictionary of Occupational Titles*." R. 26. Pursuant to medical-vocational grid rule 201.11, the ALJ found the Plaintiff to be "not disabled."

## III. DISCUSSION

### A. Standard of review

Because the Appeals Council denied review, the ALJ's decision stands as the final decision of the Commissioner. *See Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). The question before the Court is whether substantial evidence supports the ALJ's findings. *See id.* The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §

405(g). Substantial evidence is "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is not the role of a court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (citations omitted).

Although the Plaintiff bears the burden of proving a disability, the ALJ must develop a full and fair record. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Although he need not address every piece of evidence or all of the testimony, the ALJ must build a "logical bridge" which connects the evidence to his conclusion. *See Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). A reviewing court should "give the opinion a commonsensical reading rather than nitpicking at it." *Rice*, 384 F.3d at 369 (citations omitted).

### B. ALJ's credibility finding

The ALJ determined that Plaintiff could perform a range of sedentary work despite her impairments. The Plaintiff contends that the ALJ's

14

credibility finding is patently wrong.

(1)

The Plaintiff alleges there is ample medical evidence which documents her problems with controlling diabetes. Her blood sugar level was consistently high, and there are no A1C tests which demonstrate "good control" for a diabetic. The Plaintiff disputes the ALJ's finding that she "went off her diet due to stress, mainly financial, and this resulted in low blood sugar." R. 21. That does not properly characterize her testimony. The Plaintiff claims that even when she characterized her blood sugars as being under control, they were somewhat elevated. She attributed the poor control to stress primarily, and being off her diet only a "little bit." Moreover, she testified that stress itself affected her blood sugar. The stress could make her go off her diabetic diet "a little bit."

The ALJ found that Plaintiff's "allegedly disabling impairments of diabetes and respiratory problems were present at approximately the same level of severity prior to the alleged onset date." R. 22. The Commissioner points to a number of records prior to the Plaintiff's alleged onset date

15

which indicate diagnoses of diabetes and breathing problems. The Plaintiff claims there is no support for the ALJ's finding that she was "less than credible" when discussing her diabetic control. There is no medical evidence of record, including objective medical tests, that contradicts her statement that her diabetes was poorly controlled. The fact that Plaintiff had a good reading at one time when other tests over time show poor control does not serve to diminish her credibility.

A review of the record shows that the ALJ discussed the Plaintiff's severe impairments and sought to accommodate her limitations accordingly. The ALJ found that, because the impairments did not then prevent the Plaintiff from working, there was a strong suggestion that they would not currently do so. The ALJ considered these medical impairments before and after the Plaintiff's alleged onset date. Thus, the Court concludes that the ALJ reasonably discounted these allegations and found that they were not disabling.

After reviewing the evidence in the record, the Court concludes that substantial evidence supports this portion of the ALJ's credibility finding.

There is no question that Plaintiff's A1C scores and blood sugar levels fluctuated to some extent during the period that she was working and after her alleged onset date.  However, as the Plaintiff herself states, there are no A1C tests in the record–before or after April 1, 2007-- which demonstrate "good control" for a diabetic.  Similarly, her blood sugar readings were poor before and after her alleged onset date.  Thus, substantial evidence supports the ALJ's credibility finding regarding the Plaintiff's ability to control her blood sugar and that the condition was not disabling.

In making his credibility finding, the ALJ also considered the Plaintiff's allegations of disabling knee problems.  Based on the diagnostic reports and clinical findings and medical opinions of record, the Court concludes that it was reasonable for the ALJ to find that Plaintiff's knee problems limited her to a range of sedentary work, but determined she was not disabled.

(2)

The Plaintiff alleges, however, that instead of examining the relevant factors, the ALJ simply used boilerplate language in rejecting her allegations.

The Plaintiff notes that the factors set out in Social Security Ruling 96-7 are as follows: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatments, other than medication, the individual receives or has received for pain or other symptoms; (6) any measures other than treatment; and (7) any other factors regarding an individual's functional limitations and restrictions due to pain or other symptoms.

The Plaintiff claims that, instead of considering these factors, the ALJ used the following language in finding she was not credible:

> [T]he medical evidence, laboratory findings and the claimant's reported activities during the years in question indicate that her functioning is considerably greater than she alleges. In evaluating the claimant's subjective complaints, the undersigned credits these to diminish her capacity for basic work activities only to the extent they are reasonably consistent with the objective medical evidence and other evidence of record. . . . While the claimant establishes impairments that could reasonably be expected to produce some of the symptoms alleged, support for the claimant's allegations as to the

frequency, intensity and persistence of these symptoms is lacking in the record. The undersigned also does not fully accept the claimant's allegations due to inconsistencies regarding the claimant's resultant limitations and her actual functioning, also noted above.

R. 24. The Plaintiff alleges there are no "inconsistencies noted above" in the decision. Although the language above is not a model of clarity, it appears that the ALJ based his finding on the fact some of her medical problems were at approximately the same level prior to her alleged onset date and they did not then prevent her from working. Accordingly, the ALJ seems to suggest he believes that Plaintiff's subjective complaints about the "frequency, intensity, and persistence of these symptoms" are exaggerated.

The Plaintiff further alleges the ALJ does not acknowledge that some of her conditions are consistent with the objective evidence, such as the radiographic evidence dated March 2007. Moreover, she claims that the ALJ refers only to one MRI from 2006. He does not mention other MRI results and x-rays which are in the record. Although the Plaintiff alleges her disability began in April 2007, she claims that the ALJ does not rely on any radiographic studies which occurred after March 2007.

The Plaintiff further claims that the "inconsistencies" cited by the ALJ may be based on his cursory discussion and alleged mis-characterization of her activities of daily living discussed on pages 18-19 of the record. However, that glosses over documentary evidence and the Plaintiff's testimony regarding her activities, which she claims is uncontradicted. The ALJ states:

> [S]he is able to wash dishes, make her bed, and occasionally vacuum, sweep or mop. She has a driver's license and is able to drive. . . She can do laundry, prepare meals, and provide childcare. She has been able to engage in work activity at various times since the alleged onset date. Based on all evidence of record, the undersigned finds the claimant has mild limitation in activities of daily living.

R. 18-19. The Plaintiff contends that the articulated reasons for finding her to be "less than credible" do not exist as a matter of fact and are patently wrong.

The Commissioner relies on the above language in arguing that Plaintiff was able to engage in a broad range of activities, which was inconsistent with her allegations of disability. Moreover, she shopped and took care of her personal hygiene. She did not need to be reminded about

taking medication or medical appointments. She had no problems concentrating or thinking and was not forgetful. As of August 2007, the Plaintiff was able to leave home three or four times per week to visit family, run errands, and go to appointments. It is appropriate to consider a claimant's activities in evaluating the severity of impairments. *See* 20 C.F.R. § 404.1529(c)(3)(i). The Commissioner contends that based on her activities, the Plaintiff was not as limited as she claimed.

The Plaintiff claims the ALJ's finding noted above is not consistent with her questionnaire which is part of the record. She has trouble getting in and out of the car and often uses cruise control. If she has to travel long distances, someone else must drive. She has trouble getting out of chairs and into the tub. She used a cane and sometimes a walker or a scooter. She frequently needs to rest. The Plaintiff is unable to do outside chores. She tries to get help grocery shopping and may need help bringing the groceries inside. The Plaintiff has difficulty doing laundry and only does it every two weeks. She states that she sometimes had to sit on the steps to go downstairs, sliding on her buttocks one step at a time. Although she

sometimes can carry the laundry basket, the Plaintiff occasionally would toss the laundry upstairs. She was only able to sweep, dust and mop once a month.

The Plaintiff completed multiple forms throughout the process. She maintains all are reasonably consistent with the information noted above. By January 2008, the Plaintiff says she was unable to work even one or two days a week. It was hard to do even the limited standing and walking that her job required. She quit when she faced termination because of her inability to work.

Although the Plaintiff certainly had some limitations with respect to common daily tasks, as noted above, it is apparent that she was able to perform many such tasks at some level, which renders some support for this portion of the ALJ's credibility finding. The ALJ reviewed those tasks which she could perform and determined that Plaintiff did not appear to be as limited as she claimed. The Court will defer to the ALJ's finding that the Plaintiff's ability in this regard weighs against her allegations of complete debility.

(3)

The Court earlier noted problems with some of the boilerplate language used by the ALJ–that the Plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms were "not credible to the extent they are inconsistent with the above residual capacity assessment."  This language, which is seen frequently in decisions from ALJs, "backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility."  *Shauger*, 675 F.3d at 696 (internal quotation marks and citation omitted).  An ALJ's assessment of an individual's residual functional capacity comes later.  *See Bjornson*, 671 F.3d at 645.  Such boilerplate language leaves reviewing courts guessing as to the weight the ALJ gave the claimant's testimony.  *See id*.

Although the above language is indeed problematic, it appears in context that the ALJ simply determined that the medical evidence did not support the Plaintiff's allegations of disability.  The ALJ considered the Plaintiff's disabling conditions before and after her alleged onset date and found that there was not much difference in the extent of those problems.

Moreover, the ALJ was not persuaded by the Plaintiff's statements about her symptoms. The ALJ explained that although her diabetes and breathing problems were present at about the same levels prior to her alleged onset date, she was able to work then. The ALJ also considered the Plaintiff's allegations of disabling knee problems, including the diagnostic reports, clinical findings and medical opinions of record. The ALJ states that he considered the Plaintiff's "obesity in combination with her other severe impairments, and finds no Listing met or equaled in consideration of obesity ." R. 20. Based on this information, the ALJ found that she was limited to a range of sedentary work, but was not disabled. Although it is a relatively close case, the Court is unable to conclude that the ALJ's credibility finding as to her severe impairments was in error.

## C. Residual functional capacity assessment

The ALJ determined that Plaintiff could perform a range of sedentary work activity despite her impairments. After considering the testimony of the vocational expert, the ALJ found that Plaintiff was not disabled and not entitled to DIB or SSI.

The Plaintiff asserts the ALJ's residual functional capacity assessment is unsupported by substantial evidence. There is no basis to doubt her testimony regarding her problems because her doctor and independent radiologists have documented her persistent problems with edema and effusions.

The Plaintiff notes that the residual functional capacity discussed by the ALJ contains no restriction on her ability to sit or stand at will, thus failing to account for her need to elevate her lower extremities when sitting or using a cane when standing or walking. However, the ALJ found that Plaintiff's right knee osteoarthritis and obesity were severe impairments and the Commissioner asserts that, to the extent the record evidence showed she was limited by these conditions, he provided for such limitations in his residual functional capacity finding. Specifically, the ALJ limited her to only sedentary work where she would have a sit/stand option. She was further limited to frequent balancing and stooping; occasional ramps, stairs, leaning, crouching, crawling; and no climbing ropes, ladders, or scaffolds. The ALJ discusses the functional limitations that can be associated with

obesity.

Based on those limitations, the Commissioner contends that the ALJ's residual functional capacity finding accommodated the limitations indicated by the evidence, including the diagnostic tests and clinical findings. Additionally, the ALJ's residual functional capacity finding was supported by the opinion of Dr. Panepinto, a State agency physician. In rendering this opinion in May 2007, Dr. Panepinto considered the Plaintiff's clinical exam findings and the diagnostic reports. He considered her history of knee pain, obesity, high blood pressure, diabetes, and breathing problems. Thus, the Commissioner alleges it was reasonable for the ALJ to rely on Dr. Panepinto's opinion. *See Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) (observing that the ALJ was justified in relying on the state agency medical consultant's report regarding the effect of the claimant's mental condition on his functional limitations). In September 2007, Dr. Bone, another State agency physician, reviewed the record and affirmed Dr. Panepinto's opinion, thus providing further support to the ALJ's residual functional capacity finding. The

Commissioner emphasizes the ALJ gave the Plaintiff even greater limitations than did the State agency physicians by limiting her to only sedentary work with a sit/stand option.

In response to the ALJ's hypothetical question, the vocational expert credibly testified that the jobs he identified could not be performed by an individual who needed to raise her leg more than a little bit under the desk. Moreover, cashiering of that type could "not be easily done" with a cane for support.

The Plaintiff claims that because the ALJ's hypothetical did not account for all of her limitations, his finding as to her residual functional capacity was flawed. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). The Commissioner asserts that Plaintiff has pointed to no medical testimony tending to show that additional limitations were necessary. Moreover, the opinions of Dr. Panepinto and Dr. Bone that Plaintiff could perform light work with certain accommodations supported the ALJ's residual functional capacity finding.

The Commissioner contends that the ALJ specifically considered the

Plaintiff's claims she needed to elevate her legs, use a cane, and use the restroom frequently. Because the Plaintiff points to no evidence from her doctors indicating those limitations, however, it appears that the ALJ found this evidence was of limited value.

The ALJ observed that the Plaintiff testified as to needing to elevate her legs, use a cane, and use the restroom frequently. However, the ALJ was not persuaded by these complaints, to the extent that they were inconsistent with other medical evidence. *See* 20 C.F.R. § 404.1529(a) (providing that self-reported symptoms and complaints are considered in conjunction and to the extent they are consistent with objective medical and other evidence).

The Court concludes that the ALJ did not give proper consideration to the Plaintiff's statements about elevating her legs. The Seventh Circuit recently stated:

> Smith contends that in evaluating her RFC, the ALJ failed to explain both why she rejected Smith's assertion that she must elevate her leg and why she found Smith not credible. Regarding leg elevation, Smith notes that the ALJ made only a cursory comment on this point: 'The medical records do not support the limitations alleged by the claimant that she is

medically required to elevate her legs.'  The ALJ failed to link any of the evidence to her conclusion regarding leg elevation, Smith asserts, and she accuses the Commissioner of trying to salvage the ALJ's conclusion through 'post hoc rationalization.'

*Smith v. Astrue*, 467 F. App'x 507 (7th Cir. 2012).  Based on the "perfunctory nature of the ALJ's discussion of leg elevation," the Seventh Circuit agreed with Smith and determined that the ALJ had not shown the requisite connection between the evidence and her decision.  *See id*.

In this case, it appears that the ALJ gave even less consideration to the Plaintiff's testimony about elevating her legs.  The ALJ mentions the Plaintiff testified "she elevates her legs for most of the day."  After then noting the Plaintiff's testimony that she frequently must use the restroom, the ALJ then recited the language that the Seventh Circuit has so often criticized as "meaningless boilerplate" or as an "unhelpful template."[2]  *See Shauger*, 675 F.3d at 696; *Bjornson*, 671 F.3d at 644-45; *Martinez*, 630 F.3d

---

[2]The ALJ's Decision stated, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  R. 21.

at 694; *Parker*, 597 F.3d at 921-22.  The Court concludes that the language used by the ALJ is entirely unhelpful in building the "logical bridge" to connect the evidence and decision.  Moreover, § 404.1529(a) is not helpful to the Commissioner because the Plaintiff's statement about the need to elevate her legs does not at all appear to be inconsistent with the medical evidence in this case.

It is not apparent whether the ALJ considered all of the Plaintiff's restrictions in assessing her residual functional capacity.  After reviewing the record, the Court must conclude that the ALJ's finding as to residual functional capacity is not supported by substantial evidence.  The vocational expert testified that no job he identified could be performed by an individual who needed to raise her leg more than a little bit under the desk.  Because the evidence regarding the Plaintiff's alleged need to elevate her legs was not developed, it is unclear whether there are any jobs she can perform.  *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *see also Young v. Barnhart*, 362 F.3d 995, 1004-05 (7th Cir. 2004).

# IV. CONCLUSION

Because the record is inadequate as to the residual functional capacity assessment, the Commissioner's decision will be reversed and the action will be remanded. The ALJ did not properly evaluate the Plaintiff's alleged need to elevate her legs. Accordingly, the residual functional capacity is not supported by substantial evidence.

On remand, the Plaintiff's obesity should also be considered in assessing the residual functional capacity. Should the matter proceed to step five, the ALJ should expressly identify any skills that are transferable, if applicable.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 15] is ALLOWED, to the extent that it requests reversal of the Commissioner's decision.

The Commissioner's Motion for Summary Judgment [d/e 17] is DENIED.

This case is remanded to the Social Security Administration for further proceedings consistent with this opinion, pursuant to 42 U.S.C. §

405(g).

ENTER: July 13, 2012

FOR THE COURT:

_s/Richard Mills_____
Richard Mills
United States District Judge